# Illinois Official Reports

## Appellate Court

---

### *People v. Rodriguez*, 2021 IL App (1st) 200173

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICARDO RODRIGUEZ, Defendant-Appellant. |
| District & No. | First District, Third Division<br>No. 1-20-0173 |
| Filed | September 22, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 96-CR-2723; the Hon. Leroy K. Martin Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Tara Thompson, Debra Loevy, and Lauren Myerscough-Mueller, of the Exoneration Project at the University of Chicago Law School, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Cathy McNeil Stein, T. Andrew Horvat, Paul A. Castiglione, and Barbara Plitz, Assistant State's Attorneys, of counsel), for the People. |

Panel                     JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justice Burke concurred in the judgment and opinion.
Justice Ellis specially concurred, with opinion.

## OPINION

¶ 1      Petitioner, Ricardo Rodriguez, was convicted of first degree murder and attempted murder in 1997. Those convictions were vacated pursuant to an agreed order in 2018, and the State declined to retry petitioner. Thereafter, petitioner filed a petition for a certificate of innocence pursuant to section 2-702 of the Code of Civil Procedure (Code) (735 ILCS 5/2-702 (West 2018)). The circuit court denied that petition, concluding that petitioner had not sustained his burden of proving his innocence, specifically noting that petitioner was essentially asking the circuit court to disregard the testimony of an eyewitness who had identified petitioner as the perpetrator, and who had never recanted that identification. Petitioner appeals the circuit court's denial of his request for a certificate of innocence.

¶ 2      Petitioner was charged by indictment with the December 16, 1995, first degree murder of Rodney Kemppainen and the attempted murder of Rudolpho Zaragoza.

¶ 3      A bench trial was conducted, during which the following evidence was elicited.

¶ 4      Aurelio Martinez testified that on December 16, 1995, he was living in a six-unit apartment building at 1604 North Hamlin Avenue. The building was near the intersection of North Avenue and Hamlin Avenue in Chicago, and there was a liquor store between his building and that intersection. Members of the Imperial Gangsters street gang would congregate near North Avenue and Hamlin Avenue. Martinez testified that he was not a member of the Imperial Gangsters or any other street gang.

¶ 5      At approximately 1:30 a.m., Martinez was dropped off at home by a friend after spending the night out at a club. Martinez testified that he and his friend left the bar at about 12:15 a.m. Martinez, who did not usually drink much, had two beers earlier that night, around 7 p.m. and 8 p.m. He was not under the influence of alcohol when he was dropped off in front of his home.

¶ 6      When Martinez arrived, he saw Rodney Kemppainen near Martinez's building. Kemppainen was not a member of a street gang and did not socialize with the Imperial Gangsters.

¶ 7      Martinez walked up to Kemppainen and they began talking in front of the door to Martinez's apartment building. After Martinez and Kemppainen talked for four or five minutes, Martinez noticed a blue car driving on Hamlin Avenue toward North Avenue. The car, facing southbound, stopped in front of where Kemppainen and Martinez were talking, about 8 to 10 feet away from them.

¶ 8      Martinez identified petitioner as the driver and sole occupant of the car. It was clear and chilly outside, and it was not raining or snowing. The lighting on the street was very bright, and Martinez could see very well. There were streetlights where he and Kemppainen were standing, and there was light from inside and outside the building that reflected out into the street.

¶ 9 Petitioner pulled up at an angle in front of another car that was parked alongside the curb. The passenger side window of the car was down, and there was nothing blocking Martinez's view of petitioner, who was sitting in the driver's seat. Petitioner just sat there for some time. Nothing covered petitioner's face or head. Martinez saw that there was light inside of the car, but he did not know if the interior light of the vehicle was on that night. Petitioner's car was stopped for between 15 and 20 seconds, and during that time, Martinez stared at petitioner, and petitioner looked back at Martinez. Petitioner did not say anything, and Kemppainen and Martinez did not say anything, either. After 15 to 20 seconds, petitioner raised his arm, pointed a gun at Kemppainen and Martinez, and began firing.

¶ 10 Martinez heard petitioner fire three or four shots. When petitioner began shooting, Kemppainen and Martinez were very close to each other, "arm to arm." Martinez pushed the front door of the apartment building open and started running up the stairs. Kemppainen ran through the front door behind Martinez. Martinez heard Kemppainen say that he was "hit," and then he fell to the floor.

¶ 11 Martinez came back down the stairs and saw Kemppainen lying on the stairs. At that point, petitioner's car was gone. Martinez moved Kemppainen to see if he was okay and saw that Kemppainen was unconscious and that there was blood coming from his chest.

¶ 12 Martinez told the police what happened when they arrived. Martinez told the officers that the shooter was a white Hispanic, with a goatee and moustache, with pushed-back hair and wearing a black jacket. Martinez could not estimate petitioner's height and weight.

¶ 13 On December 27, 1995, Detective Rey Guevara went to Martinez's home and showed him a photo array that included petitioner's picture. Martinez picked petitioner's picture from the array but told the detectives that he wanted to see petitioner in person or in a lineup to confirm that he was correct.

¶ 14 Three days later, Martinez went to the police station and viewed a lineup containing five people. Martinez picked petitioner from that lineup as the person who shot Kemppainen. As soon as they opened the door to the lineup room and let him view the lineup, Martinez recognized petitioner as the person who shot Kemppainen. Martinez was sure that petitioner was the shooter.

¶ 15 Zaragoza testified that, at the time of the shooting, he was walking northbound down Hamlin Avenue and was coming from a friend's house. Zaragoza acknowledged that, about five hours earlier that evening, he smoked a rock of crack cocaine and drank two cans of beer. Zaragoza testified that he was no longer under the influence of drugs or alcohol at the time of the shooting. Zaragoza had been smoking cocaine on and off for nine years and had previously been convicted of delivery of a controlled substance and was sentenced to two years' probation, which was terminated satisfactorily.

¶ 16 Around 1:30 a.m., Zaragoza was walking to the liquor store on the northwest corner of Hamlin Avenue and North Avenue. As Zaragoza crossed North Avenue, he heard shots coming from the other side of Hamlin Avenue. Zaragoza looked in the direction of the shots and saw a blue two-door car driving southbound on Hamlin Avenue toward him. Petitioner was driving and was the sole occupant of that car. Zaragoza had seen petitioner prior to that evening around the neighborhood, but he did not know him or his name. Zaragoza knew petitioner to be a member of the Spanish Cobras street gang. At the time of the shooting, the Spanish Cobras and Imperial Gangsters were "at war." Although Zaragoza was not an active member at the

time of the shooting, he had previously been a member of the Imperial Gangsters from 1978 to 1984.

¶ 17 When petitioner's car reached the intersection of North and Hamlin Avenues, petitioner started to make a right turn to head westbound toward North Avenue. Zaragoza testified that, at this point, petitioner tried to run Zaragoza over with his car. Zaragoza rolled out of the way and landed on the curb. Zaragoza estimated that the car was traveling between 10 and 20 miles per hour when it was coming toward him.

¶ 18 After Zaragoza rolled to the curb, the car came to a stop, and Zaragoza looked at petitioner. The streetlights were on, and the area was brightly lit. Petitioner did not have anything covering his face, and there was nothing obstructing Zaragoza's view of petitioner. The passenger side window of the car was down. After petitioner's car came to a stop, petitioner said, "Gangster killer, mother f***." Zaragoza understood that to mean that petitioner wanted to kill him and that the term "gangster" referred to the Imperial Gangsters street gang.

¶ 19 Petitioner fired two shots at Zaragoza from six to eight feet away. Petitioner was sitting in the driver's side of the car and was firing out of the passenger side window. Petitioner then began to drive westbound on North Avenue, and Zaragoza ran into the liquor store on the corner. Zaragoza talked to some people who were inside the liquor store and then returned to the street.

¶ 20 Zaragoza flagged down a squad car and told the officers what had happened. As Zaragoza was talking to the police officers, Zaragoza went to 1604 North Hamlin Avenue and saw Kemppainen's body lying on the stairs.

¶ 21 Zaragoza described petitioner to the police as a black Latino with a mustache, a goatee, and pushed-back black hair. Zaragoza also described petitioner's car to the police on the night of the shooting. Zaragoza did not tell the officers that night that he knew petitioner. That night, officers showed Zaragoza some pictures and a "Cobra gang book" that included pictures of most members of the gang. Zaragoza did not identify petitioner at that point and testified that he did not see petitioner's picture in the book.

¶ 22 On December 27, 1995, around 8 p.m., at the intersection of Hamlin Avenue and LeMoyne Avenue, Detective Guevara showed Zaragoza a photo array. Zaragoza identified petitioner's photograph as the person who shot at him. Zaragoza also identified petitioner in a lineup and stated that he had no hesitation in identifying petitioner and was "100 percent sure."

¶ 23 Detective Guevara testified, confirming the photo array and lineup identifications made by Martinez and Zaragoza. The parties stipulated to the medical examiner's report, which detailed the cause of Kemppainen's death as a gunshot wound to his back that exited out from his chest.

¶ 24 After the State rested, the defense rested without presenting evidence.

¶ 25 Following closing arguments, the trial court found petitioner guilty on all counts. The trial court specifically found Martinez's testimony to be "very clear, very good." The trial court stated that Martinez's "demeanor while testifying was reassuring to the court" and that he demonstrated an "excellent" "ability to remember and relate." The court concluded that Martinez's identification was "very clear, very convincing" and that, "based on [Martinez]'s testimony alone," the court was convinced that the State had proven petitioner's guilt.

¶ 26 Regarding Zaragoza, the trial court commented that he carried "a lot of baggage," particularly based on his drug use and prior criminal history and that the court looked at his testimony "with great suspicion." The court remarked that, if Zaragoza had been the only

witness against petitioner, the court would have "f[ound] in favor of [petitioner]." However, Zaragoza's testimony ultimately bolstered and corroborated the testimony of Martinez. The trial court rejected the defense's argument that Zaragoza was motivated to testify falsely against petitioner because of their rival gang affiliations and concluded that, "even with [his] baggage," Zaragoza's testimony was based on what occurred that night.

¶ 27 Petitioner filed a motion for a new trial and, thereafter, an amended motion for new trial. At the hearing on that motion, petitioner presented an affidavit from Zaragoza in which Zaragoza stated that he previously identified petitioner as the shooter. Zaragoza averred that petitioner's face "looked familiar" but he was having "second thoughts about [his] identification" and had been "tossing and turning at night thinking it might not be him." Zaragoza stated that there were "a lot of faces that look alike" and he did not "want somebody to go down for something he didn't do." Zaragoza further stated that the police informed him that petitioner was a Spanish Cobra and that petitioner was "locked up" when they showed him the array.

¶ 28 The trial court denied petitioner's posttrial motion, viewing the recantation with "grave doubt." The court explained that it found the recantation "very suspect based on the testimony that I heard in the trial," which was "so clear and convincing" that there was "not a doubt in the Court's mind."

¶ 29 Following a sentencing hearing, the trial court imposed consecutive sentences of 60 years on the murder count and 30 years on the attempted murder count.

¶ 30 On direct appeal, petitioner's convictions were affirmed; however, this court concluded that the trial court erred in imposing consecutive sentences. *People v. Rodriguez*, No. 1-97-4361 (2000) (unpublished order under Illinois Supreme Court Rule 23). On September 21, 2001, the trial court resentenced petitioner to concurrent prison sentences pursuant to the appellate mandate.

¶ 31 Petitioner subsequently filed a postconviction petition, alleging, among other things, that he was actually innocent. In support, petitioner provided affidavits from his mother and sister, averring that they had seen him at home that evening around 10:30 or 11 p.m., before they went to sleep. Petitioner also included an affidavit from Zaragoza, more plainly recanting his previous identification of petitioner and stating that petitioner was not the shooter. Zaragoza stated that detectives "strongly hinted to" him that he should identify petitioner as the shooter and that he was "stuck and felt intimidated." Petitioner also provided an affidavit from Ricardo Sierra, who averred that he was friends with Kemppainen, he saw the shooting, and petitioner was not the shooter. Sierra further stated that he approached officers at the scene and tried to give them a description of the shooter as a "dark guy with short hair" but was told by one officer to "get the f*** out of here before you go to jail."

¶ 32 In March 2018, the circuit court entered an agreed order granting postconviction relief, vacating petitioner's conviction, granting the State's motion to invoke *nolle prosequi* of the charges, and releasing petitioner from custody of the Illinois Department of Corrections.

¶ 33 Petitioner subsequently filed his petition for a certificate of innocence. Petitioner argued that there were flaws with Martinez's and Zaragoza's identifications and that they only identified petitioner after Detective Guevara became involved in the investigation. Petitioner stated that there was a "line of recent cases in which courts have confirmed that [Guevara] *** committed misconduct in securing identifications or confessions." Petitioner also pointed out that Zaragoza had recanted his identification, that Sierra had come forward to aver that

petitioner was not the shooter, and that petitioner's mother and sister averred that he was at home that night.

¶ 34 In support of the petition, petitioner attached, among other things, the affidavits included in his postconviction petition. Petitioner also attached evidence of Guevara's history of misconduct in other cases and transcripts of a deposition taken of Guevara in which he was asked about many investigations, including the one involving petitioner. In those transcripts, Guevara asserted his fifth amendment privilege in response to virtually every question.

¶ 35 The petition was heard by a different trial judge than the one who had conducted petitioner's trial. The parties submitted transcripts from the trial and briefed whether petitioner satisfied his burden of establishing his innocence.

¶ 36 In ruling on the petition, the circuit court observed that it was a "difficult case" and that it "boil[ed] down to" whether petitioner "sustained his burden [of] showing that he was actually innocent."

¶ 37 The circuit court described Zaragoza's and Sierra's affidavits, noting that they both had some issues of credibility. In reference to Zaragoza's affidavit, the circuit court stated that "case law tells us that notoriously recantations are not reliable." Regarding Sierra's affidavit, the court noted that Sierra described Kemppainen as his friend, yet Sierra waited until 20 years after the shooting to come forward with information about who killed Kemppainen. The court also described the affidavits of petitioner's mother and sister, stating that they averred that "they saw [petitioner] come into the house at about 10:30 and went to sleep and then they went to sleep; but, of course, we know that the shooting was at 1:30 a.m."

¶ 38 The circuit court continued,

"And then of course we have Mr. Martinez who identified [petitioner] and has not recanted. [Petitioner] argues because of malfeasance that Detective Guevara has engaged in over the years that somehow the Court should believe that Mr. Martinez's testimony is somehow skewed or not believable. *** [B]asically what the petitioner is asking me to do is to disregard Mr. Martinez's testimony or to find Mr. Martinez's testimony to be unbelievable, but then Mr. Sierra who comes along 20 years after the fact, that he is believable. And that I ought to believe the recantation of [Zaragoza]. *** I just don't think [petitioner] has carried his burden. *** [O]bviously I understand the arguments about Detective Guevara, but there is nothing in the record to indicate to me that Guevara put some sort of undue pressure on Martinez to cause Martinez to testify the way he did. So the petitioner is left to just tell me to assume or to speculate because Guevara is a bad actor, that he's a bad actor in this case."

¶ 39 The circuit court concluded that "if this were a criminal trial I'd find [petitioner] not guilty because I don't think that the evidence is sufficient to prove him guilty beyond a reasonable doubt. But the burden has shifted here *** to [petitioner] and he's got to prove by a preponderance that he is innocent." The court concluded that petitioner had not met that burden and, accordingly, denied petitioner's request for a certificate of innocence.

¶ 40 Petitioner filed a timely notice of appeal, and in this court, petitioner contends that the circuit court erred in finding that he failed to prove his innocence by a preponderance of the evidence. Petitioner maintains that he proved his innocence based on Zaragoza's recantation, Sierra's affidavit, and the affidavits of his mother and sister. Petitioner also contends that evidence that the investigating detectives, Guevara and his partner, Halvorsen, "perpetrated an

established pattern and practice of misconduct" in improperly influencing identifications also establishes proof of his innocence. Petitioner asks this court to reverse the circuit court's denial of his petition and grant him a certificate of innocence.

¶ 41 A person who was wrongly convicted and imprisoned may file a petition for a certificate of innocence in the circuit court to seek compensation in the Court of Claims. See 735 ILCS 5/2-702(a), (b) (West 2018); 705 ILCS 505/8(c) (West 2018). To obtain a certificate of innocence under section 2-702 of the Code, a petitioner must prove by a preponderance of the evidence that:

"(1) [he] was convicted of one or more felonies by the State of Illinois and subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;

(2)(A) the judgment of conviction was reversed or vacated, and the indictment or information dismissed or, if a new trial was ordered, either [he] was found not guilty at the new trial or [he] was not retried and the indictment or information dismissed; or (B) the statute, or application thereof, on which the indictment or information was based violated the Constitution of the United States or the State of Illinois;

(3) [he] is innocent of the offenses charged in the indictment or information or his *** acts or omissions charged in the indictment or information did not constitute a felony or misdemeanor against the State; and

(4) [he] did not by his *** own conduct voluntarily cause or bring about his *** conviction." 735 ILCS 5/2-702(g) (West 2018).

¶ 42 Here, the circuit court found that petitioner satisfied three of the four elements of section 2-702 but failed to demonstrate that he was innocent of the offenses charged in the indictment by a preponderance of the evidence.

¶ 43 Initially, the parties disagree as to the standard of review to be applied in this case. Petitioner asserts that we should review *de novo* the circuit court's ruling that he failed to prove his innocence by a preponderance of the evidence. Petitioner acknowledges that this court has applied an abuse of discretion standard of review to denials of certificates of innocence but asserts that a *de novo* standard is appropriate in this case because "the circuit court here adjudicated the case solely on the same documentary proofs and cold record presently before this Court."

¶ 44 It is well settled that the determination of whether a petitioner is entitled to a certificate of innocence is committed to the discretion of the circuit court. *Rudy v. People*, 2013 IL App (1st) 113449, ¶ 11; *People v. Dumas*, 2013 IL App (2d) 120561, ¶ 17; *People v. Pollock*, 2014 IL App (3d) 120773, ¶ 27; *People v. Glenn*, 2018 IL App (1st) 161331, ¶ 14; *People v. McClinton*, 2018 IL App (3d) 160648, ¶ 14; *People v. Hood*, 2021 IL App (1st) 162964, ¶ 23; *People v. Gomez*, 2021 IL App (1st) 192020, ¶ 40; *People v. Washington*, 2020 IL App (1st) 163024, ¶ 22; see also *Betts v. United States*, 10 F.3d 1278, 1283 (7th Cir. 1993); *United States v. Grubbs*, 773 F.3d 726, 731 (6th Cir. 2014) ("Appellate courts review a district court's decision to grant or deny a certificate of innocence for abuse of discretion."); *United States v. Graham*, 608 F.3d 164, 166 (4th Cir. 2010) (noting that federal district courts are afforded "substantial discretion" in determining whether to grant a certificate of innocence). Proceedings requesting a certificate of innocence are civil in nature, and as stated above, a petitioner bears the burden of proving the requirements to entitle him to such relief, including that he is innocent of the

charged offenses, by a preponderance of the evidence. 735 ILCS 5/2-702(g) (West 2018). Inherent in such proceedings, a trial judge must consider and weigh the evidence presented, including admissibility and any credibility issues, to determine if the petitioner has met that burden, matters which are generally committed to the discretion of the trial court. See *Mathey v. Country Mutual Insurance Co.*, 321 Ill. App. 3d 805, 815 (2001) ("In a nonjury trial, the trial court's factual findings, its weighing of evidence, and its assessment of credibility are entitled to great deference and will not be reversed on appeal unless the factual findings are against the manifest weight of the evidence."). Indeed, the statute itself explicitly provides that a trial court shall "*exercis[e] its discretion* as permitted by law regarding the *weight* and admissibility of evidence submitted pursuant to this Section" (emphases added) 735 ILCS 5/2-702(a) (West 2018)), when determining whether a petitioner is entitled to a certificate of innocence. That is precisely what the trial court did in this case when it reviewed the evidence and determined that the accounts provided by Zaragoza and Sierra suffered from significant credibility issues. The court then weighed those accounts against the trial evidence, including the credible testimony of Martinez, and concluded that petitioner had not proven by a preponderance of the evidence that he was innocent of the charged offenses. These kinds of factual findings are not reviewed under a *de novo* standard of review. See *Mathey*, 321 Ill. App. 3d at 815.

¶ 45    Regardless of whether a petitioner chooses to proceed through live testimony or documentary evidence, the petitioner's burden—to prove the requirements of the statute by a preponderance of the evidence—remains unchanged. 735 ILCS 5/2-702(g) (West 2018). So too does the trial court's obligation to weigh the evidence presented and determine whether the petitioner has met that burden. 735 ILCS 5/2-702(a) (West 2018). Concomitantly, a petitioner cannot alter the standard of review on appeal by choosing to proceed through documentary evidence. Accordingly, this court has applied an abuse of discretion standard, even where a petitioner proceeded solely on documentary evidence without an evidentiary hearing. See *Gomez*, 2021 IL App (1st) 192020, ¶ 40 (where the trial court considered and denied the petitioner's certificate of innocence petition solely on the documentary evidence and the arguments of counsel, the trial court's denial would be reviewed for an abuse of discretion); *McClinton*, 2018 IL App (3d) 160648, ¶¶ 7, 22 (reviewing the trial court's denial of a petition for a certificate of innocence on the petition and the State's objection without an evidentiary hearing for an abuse of discretion).

¶ 46    The two cases that petitioner relies on to argue that *de novo* review is appropriate are clearly distinguishable from the case at bar. Both *Dumas*, 2013 IL App (2d) 120561, ¶ 17, and *Rudy*, 2013 IL App (1st) 113449, ¶ 11, recognized that whether a petitioner is entitled to a certificate of innocence is generally committed to the sound discretion of the court. However, in those cases, the courts determined that the issue on appeal was one of statutory interpretation. *Dumas*, 2013 IL App (2d) 120561, ¶ 17 (reviewing the statutory language to determine whether the reversal of the petitioner's conviction on appeal sufficed to show that he was innocent of the charge and that he did not act in a way that brought about his conviction); *Rudy*, 2013 IL App (1st) 113449, ¶ 11 (reviewing whether the statute allowed an estate to pursue a certificate of innocence on behalf of a deceased defendant). Here, there is no similar question of statutory interpretation presented on appeal. The other cases cited by petitioner are also inapplicable, as they are not appeals from proceedings for certificates of innocence.

¶ 47        Although our ultimate decision would not change regardless of which standard of review was employed, we will review the circuit court's ruling that petitioner failed to prove he was innocent of the charged offense for abuse of discretion consistent with the overwhelming precedent. This standard is the most deferential standard of review recognized by the law. *People v. Coleman*, 183 Ill. 2d 366, 387 (1998). A trial court abuses its discretion only when its ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *People v. Santos*, 211 Ill. 2d 395, 401 (2004).

¶ 48        In this case, we find ample evidence from which a reasonable trier of fact could find that petitioner failed to prove his innocence by a preponderance of the evidence.

¶ 49        The evidence at petitioner's trial included testimony from Martinez that petitioner was the person who shot Kemppainen. Martinez's testimony also established that he had an excellent opportunity to view petitioner, as he stared at him for 15 to 20 seconds before the shooting. Martinez also testified that he did not belong to a gang, suggesting that he had no motive to lie. Although Martinez provided only a tentative identification of petitioner in the photo array, noting that he wanted to make sure that he was correct by viewing him in person, Martinez immediately chose petitioner from the lineup and testified that he was positive of that identification.

¶ 50        The trial court found Martinez's testimony to be very credible, specifically praising his demeanor, memory, and ability to communicate. The court found his identification of petitioner to be "very clear, very convincing," and specifically opined that Martinez's testimony alone provided sufficient evidence of petitioner's guilt.

¶ 51        Many of petitioner's arguments in the circuit court, and in this court, effectively request an inference that petitioner's conviction was based on misconduct by Guevara during the investigation. Petitioner asserts that, since his conviction, evidence has come to light showing Guevara's pattern of misconduct during his time as a detective in the Chicago Police Department. Indeed, this court has recognized that Guevara has a history of misconduct and influencing witnesses. See, *e.g.*, *People v. Montanez*, 2016 IL App (1st) 133726, ¶ 35; *People v. Almodovar*, 2013 IL App (1st) 101476, ¶ 79. Considering Guevara's history of misconduct, petitioner invited the circuit court to reject the reliability of Martinez's testimony in ruling on his petition for a certificate of innocence and to speculate that Detective Guevara unduly influenced that testimony. We cannot conclude that the court abused its discretion in refusing to so speculate.

¶ 52        Despite Guevara's well-documented history of witness intimidation and other misconduct, there is no evidence that such misconduct occurred in this case. Although Zaragoza avers that Guevara "strongly hinted" that he should identify petitioner and that Zaragoza felt "stuck and intimidated," Zaragoza never specifically described Guevara's conduct or how he "hinted" to him. Nonetheless, even crediting Zaragoza's averments, they would not be sufficient to establish petitioner's innocence when weighed against the other evidence presented in this case, in particular, Martinez's testimony.

¶ 53        Petitioner, however, asked the circuit court to assume that Martinez's identification of him was the product of misconduct, because Guevara asserted his fifth amendment rights when questioned about this case and argues in this court that the circuit court improperly "failed to give any weight to [Guevara's] invocation of the Fifth Amendment." "[A]lthough a court may draw a negative inference from a party's refusal to testify, it is not required to do so." *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 107. In these circumstances, the decision as to whether

to draw a negative inference was properly a matter of the circuit court's discretion, and we can find no abuse of discretion here. Additionally, although petitioner attached to his petition examples of Guevara's misconduct in other cases, this court has recognized that evidence of Guevara's misconduct in other cases is immaterial and does not support a claim of actual innocence. *People v. Gonzalez*, 2016 IL App (1st) 141660, ¶ 58.

¶ 54    Although petitioner relies on the affidavits of Zaragoza and Sierra to contend that they establish his innocence, the circuit court was not required to credit those affidavits over the testimony of Martinez. This conclusion is particularly apt here, where the affidavits provided by Zaragoza and Sierra indicated that both witnesses suffered significant credibility issues. As the circuit court noted, Zaragoza's affidavit would likely be viewed with skepticism, as recantations are inherently unreliable. See *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). Moreover, we note that Zaragoza's recantation would be looked at with even greater suspicion, as his accounts have changed more than once throughout these proceedings. Zaragoza initially identified petitioner, stating that he was "100 percent sure" that petitioner shot him, and later stated that he was "having second thoughts" and it "might not be him." Even later, Zaragoza stated that petitioner was affirmatively not the shooter. Regarding Sierra, his credibility could be challenged by his failure to come forward with information until 20 years after the shooting of Kemppainen, whom Sierra described as his friend. Particularly in light of these issues, the circuit court was not required to accept those affidavits over the credible testimony of Martinez at petitioner's trial.

¶ 55    The other affidavits petitioner has submitted in support of his certificate of innocence also do not establish his innocence by a preponderance of the evidence. Although petitioner characterizes the affidavits of his mother and sister as an "unrebutted alibi," they aver only that they saw him at home that evening around 10:30 or 11 p.m. before going to sleep themselves, inferring that he stayed home the rest of the night. An alibi is defined as a "defense based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant time." Black's Law Dictionary 79 (8th ed. 2004). As the circuit court observed, the affidavits here have little to no value where the crime was committed approximately three hours after the affiants claimed to have seen petitioner.

¶ 56    If any of petitioner's new evidence would have been presented at trial, it may have served to cast doubt on the State's case or on Martinez's identification of petitioner in proving petitioner guilty beyond a reasonable doubt. However, petitioner's burden to prove that he is innocent by a preponderance of the evidence is a different, more exacting standard. See *Dumas*, 2013 IL App (2d) 120561, ¶ 19; *Pollock*, 2014 IL App (3d) 120773, ¶ 37 ("the Code contemplates the differences between actual innocence and a finding by a court of review that no rational jury could find beyond a reasonable doubt that the State proved all elements of the crimes charged" (citing *People v. Fields*, 2011 IL App (1st) 100169, ¶ 19)). We find no abuse of discretion in the circuit court's conclusion that petitioner failed to meet that burden.

¶ 57    Petitioner alternatively asserts that he is entitled to a certificate of innocence, pursuant to section 5-5-4(c) of the Unified Code of Corrections (730 ILCS 5-5-4(c) (West 2018)), because "his innocence was established in post-conviction proceedings." Section 5-5-4(c) provides, in relevant part, that "[i]f a conviction has been vacated as a result of a claim of actual innocence *** and the provisions of paragraphs (1) and (2) of subsection (g) of Section 2-702 of the Code of Civil Procedure are otherwise satisfied, the court shall enter an order for a certificate of innocence." *Id.*

¶ 58        Initially, we note that this argument was not included in petitioner's petition for a certificate of innocence, which was brought pursuant to section 2-702 of the Code (735 ILCS 5/2-702 (West 2018)). Accordingly, petitioner did not ask the circuit court to review his request for a certificate of innocence pursuant to this section. The first time that petitioner raised this argument was in this appeal. "It is well settled in Illinois that an appellant who fails to raise an issue before the trial court forfeits the issue and may not raise it for the first time on appeal." *Williams v. Bruscato*, 2019 IL App (2d) 170779, ¶ 24. "The purpose of the forfeiture rule 'is to encourage parties to raise issues in the trial court, thus ensuring both that the trial court is given an opportunity to correct any errors prior to appeal and that a party does not obtain a reversal through his or her own inaction.' " *Id.* (quoting *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 14). Because petitioner did not raise this claim before the circuit court, we conclude that it is forfeited for purposes of appeal.

¶ 59        Forfeiture aside, this provision has no application here, as the circuit court did not enter an order vacating petitioner's conviction based upon evidence of actual innocence. While the circuit court in the underlying criminal case entered an agreed order setting aside petitioner's criminal conviction, there was nothing in that order to indicate that the State specifically agreed with petitioner's claim of actual innocence. Instead, the State moved to invoke *nolle prosequi* on the charges, which is a litigation decision and not a concession of petitioner's innocence. See *People v. Hughes*, 2012 IL 112817, ¶ 23 ("A *nolle prosequi* is not an acquittal of the underlying conduct that served as the basis for the original charge ***."); *Fields*, 2011 IL App (1st) 100169, ¶ 19 (holding that, in proceedings for a certificate of innocence, it is not enough that the petitioner was found not guilty at a retrial; instead, a petitioner must show by a preponderance of the evidence that he is innocent). Accordingly, there was no basis for issuing a certificate of innocence pursuant to section 5-5-4(c) of the Unified Code of Corrections, and the circuit court did not abuse its discretion in denying the petition.

¶ 60        For the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 61        Affirmed.

¶ 62        JUSTICE ELLIS, specially concurring:

¶ 63        I concur in the majority's well-reasoned opinion and would likewise affirm the judgment below. But I would affirm it based on a *de novo* standard of review.

¶ 64        The case law, including a case on which I recently concurred, stands for the proposition that the trial court's judgment on whether to grant a certificate of innocence is reviewed for an abuse of discretion, even when the circuit court reviewed only documentary evidence in reaching its findings and conclusions. I do not believe the abuse-of-discretion standard is appropriate in that instance.

¶ 65        When, as here, the circuit court reviews only a documentary record, hears no new evidence, and has no particularized familiarity with the defendant's case, our review is traditionally *de novo*. That is true, for example, in reviewing judgments at the third stage of postconviction proceedings under these circumstances. See, *e.g.*, *People v. English*, 2013 IL 112890, ¶ 24 (as court "heard no new evidence," "had no special expertise or familiarity with defendant's trial," and merely "reviewed the trial transcripts and heard arguments of counsel," *de novo* review was proper); *People v. Sanders*, 238 Ill. 2d 391, 398 (2010) (*de novo* review appropriate when "the court heard no new evidence; rather, the court reviewed the transcripts from the trial and

- 11 -

heard arguments of counsel" and given that "the judge had no special expertise or familiarity with defendant's trial").

¶ 66    Another good analogy to the posture of this case is our treatment of the trial court's judgment on administrative review. The trial court does not entertain new evidence; it reviews a cold administrative record and hears arguments of counsel. See *Danigeles v. Illinois Department of Financial & Professional Regulation*, 2015 IL App (1st) 142622, ¶ 69. We do not defer to the trial court's ultimate judgment or reasoning. Indeed, we do not even *review* the circuit court's judgment, much less defer to it. See *Lipscomb v. Housing Authority of County of Cook*, 2015 IL App (1st) 142793, ¶ 11 ("[T]his court reviews the decision of the administrative agency, not the decision of the circuit court.").

¶ 67    The reason we do not defer to the trial court's judgment in these instances is that we are literally performing the same function as the trial court, reading a paper record and listening to lawyers' arguments. When we perform the identical function as the trial court, we have always considered our review to be *de novo*. See *People v. McDonald*, 2016 IL 118882, ¶ 32. We do not defer to the trial court's judgment or reasoning; our analysis is "completely independent of the trial court's decision." *Id.*

¶ 68    The posture here is no different. We are reviewing the same documentary evidence as the trial court, performing precisely the same function. There is no good reason why we should discount our own read of the record, in favor of that of the circuit court, under a deferential standard of review.

¶ 69    Yes, we typically defer to the trier of fact's credibility and factual findings, but only because the court heard live testimony and was thus in a superior position to gauge the conduct and demeanor of the witnesses. See *In re Marriage of Manker*, 375 Ill. App. 3d 465, 477 (2007). When the factual and credibility findings are based on documentary evidence only, we can make our own factual and credibility findings just as easily.

¶ 70    I would apply *de novo* review but otherwise concur in the judgment and reasoning.