NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 250666-U

NOS. 4-25-0666

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 2, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| KELYI G. KABONGO, | ) | No. 21CF907 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | J. Jason Chambers, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Vancil and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*: The second-stage dismissal of defendant's postconviction petition, alleging plea counsel was ineffective for inducing defendant to plead guilty, was properly dismissed because the record refuted any claim (1) defendant did not understand the proceedings and (2) the plea was not made knowingly and voluntarily. Additionally, if plea counsel suggested a five-year sentence, which was in the appropriate range, such an assessment was reasonable given the facts known to counsel when defendant pleaded guilty. Moreover, the facts revealed defendant would not have rejected the plea offer and demanded a trial, as the evidence against defendant was strong, several charges brought against defendant were dropped in exchange for his plea, and the evidence indicated defendant wanted no trial at all.

¶ 2    Defendant, Kelyi G. Kabongo, was charged with two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2020)) and one count of unlawful restraint (720 ILCS 5/10-3 (West 2020)). He pleaded guilty to one count of criminal sexual assault, and in exchange, the State dismissed the two other counts and the charges brought against him in three separate cases. Following a sentencing hearing, defendant was sentenced to 15 years' imprisonment. He

appealed, arguing his sentence was excessive. We affirmed. *People v. Kabongo*, 2024 IL App (4th) 230450-U, ¶ 41.

¶ 3        Thereafter, with the help of private counsel, defendant filed a petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2024)). He alleged he was denied due process when the public defender, who represented him when he pleaded guilty, "lulled" him into believing he would "probably" receive five years' imprisonment following the sentencing hearing. Because the trial court did not rule on defendant's petition within 90 days after it was filed, the court advanced the petition to the second stage of postconviction proceedings (see 725 ILCS 5/122-2.1(b) (West 2024)). The State moved to dismiss the petition. The court granted the motion. Defendant appeals. We affirm.

¶ 4                                I. BACKGROUND

¶ 5        The facts in this case are well known to the parties and this court. Accordingly, we recite here only those facts necessary to understand the issue raised on appeal.

¶ 6        Submitted with the record on appeal was a video recorded police interview with the victim, L.A. L.A. stated she was embarrassed, disgusted, and felt dirty about what had happened. She paused during the interview in an attempt not to cry and openly cried at other points.

¶ 7        L.A. stated during the interview she was celebrating her birthday with family and friends on the evening of August 21, 2021. One of the places she stopped during the festivities was a hotel in Bloomington, Illinois. Defendant was at the hotel. Although L.A.'s family knew defendant very well, she did not know him at all.

¶ 8        Early the next morning, L.A. wanted to leave the hotel and go home. Her niece, who had driven L.A. around the night before, told her to ask defendant to take her, as her niece

was headed in the opposite direction of L.A.'s house. Defendant, who had been flirting with L.A. and telling her she looked like his ex-girlfriend, agreed to drive L.A. home. Defendant and L.A. talked in the car about people they knew. During the conversation, L.A. detected defendant's accent and never indicated she had difficulty understanding him. Before dropping her off at her home, defendant told L.A. he needed to stop at a friend's apartment.

¶ 9 Defendant's friend and other people were at the apartment. L.A., who had been smoking marijuana and drinking various alcoholic beverages during her birthday celebration, including one drink defendant gave her, went to a bedroom in the apartment to smoke more marijuana. While waiting on a bench at the end of the bed in the room, she became very woozy. She leaned back on the bed and began sleeping.

¶ 10 L.A. woke up when defendant pulled her top down, lifted her skirt, and started throwing her legs around. L.A. indicated she had no control over her legs, which she said felt like "noodles." She unsuccessfully tried to push defendant away from her and told him 20 to 25 times, "Stop, No, Don't." Defendant replied, "Come on, man," and persisted, using "full force" to penetrate her vagina and anus. The force defendant used caused L.A.'s vagina and anus to "rip" and subsequently bleed profusely. During the incident, two braids pinned in L.A.'s hair fell out. No one in the apartment, including a man who was in the bedroom with L.A. and defendant, came to her rescue. L.A. feared the other man in the room may have attempted to assault her when defendant was finished. Only after L.A. began crying did defendant stop. When he did, she pushed him off of her, ran out of the apartment, and sat near defendant's car in the parking lot.

¶ 11 Defendant approached her and asked what was wrong. L.A. told defendant he raped her. While driving L.A. home, defendant tried to talk to L.A. about what had happened, but L.A. stopped him, reiterating he raped her. When defendant arrived at L.A.'s house, she

slammed the car door and ran inside.

¶ 12       Two days later, L.A. went to the hospital for treatment at her mother's urging. Testing done on L.A.'s clothing and swabs taken from an internal examination tested positive for defendant's DNA.

¶ 13       Soon thereafter, defendant was arrested and charged. One count of criminal sexual assault alleged defendant forcefully penetrated L.A.'s vagina with his penis (count I). The other count alleged defendant forcefully penetrated L.A.'s anus with his penis (count II). The unlawful restraint count charged defendant with unlawfully detaining L.A. by pinning her down (count III).

¶ 14       While defendant was in police custody, he made a number of phone calls to friends. Recordings of these calls were made part of the record on appeal. Defendant had no problem navigating the jail's automated phone system to retrieve his messages and place phone calls. Defendant spoke English with an accent and had no issue understanding what the people he called discussed with him and writing down phone numbers he was given.

¶ 15       In the first phone call, defendant asked for L.A.'s sister's phone number. He subsequently called defendant's sister, whom he referred to as "Ma." She assured defendant L.A. was not going to go to court. Other people with whom defendant spoke confirmed the case would be dropped if L.A. failed to appear for a trial. Defendant seemed aware of this and other legal issues, asking one friend who was arrested in Wisconsin whether she "bond[ed] out with a [personal recognizance (PR)] bond."

¶ 16       During pretrial proceedings, the State filed two motions *in limine*. The State sought to (1) call at trial a woman, M.B., whom defendant attacked in a very similar way approximately 16 months earlier, and (2) admit at trial statements L.A. had made because

defendant, by talking to L.A.'s sister, attempted to dissuade L.A. from testifying. Rulings on these motions were stayed until closer to trial.

¶ 17            On January 30, 2023, after the State's motions *in limine* were filed, defendant agreed to plead guilty to count I in exchange for the State dismissing counts II and III and charges brought against defendant in three separate cases (McLean County case Nos. 22-CF-707, 22-CF-1237, and 22-CF-584). A standard written form evidencing the plea agreement, which defendant, plea counsel, and the State signed, provided space for the inclusion of any sentence to which the parties agreed. It stated, "The [trial] court will impose as a maximum sentence in this case the following." All the subsections under this part of the standard form were blank. Under the next section of the standard form, which provided, "It is stipulated that the defendant's prior record is as follows," it was written, "[W]ill refer to [the presentence investigation report (PSI)], none known at this time."

¶ 18            In admonishing defendant about the terms of the agreement, the trial court told him, "[E]very question I ask you isn't the same answer. So *** they're not all going to be yes or all be no, so I need to make sure that you're listening and paying attention to what *** it is I'm saying when I ask if you understand. All right?" Defendant replied, "Yes, Your Honor." The court then told defendant count I, the criminal sexual assault charge to which he was pleading guilty, was a Class 1 felony; no term of probation could be imposed; he would have to serve a sentence between a "*minimum of 4 years in the Department of Corrections [(DOC)], and a maximum of 15 years in the [DOC]*," and the prison term "would be served at 85 percent." (Emphasis added.) Defendant indicated he understood these conditions, replying "Yes, Your Honor," when the court asked. Even though defendant assured the court he understood, the court inquired, "Do you need a minute? We can take time if you need it. I need to make sure you

understand. Okay?" Defendant again assured the court he understood, responding, "Yes, sir."

¶ 19    After the details of the plea agreement were relayed to defendant, the trial court asked, "Is that your understanding of the agreement?" Defendant answered, "Yes, Your Honor." The court asked, "Other than what's been spelled out here today in this agreement, has anybody made any promises, threats, or force against you in exchange for your entering into this agreement?" Defendant replied, "No, Your Honor." The court asked defendant if he was entering his guilty plea freely and voluntarily, and defendant responded, "Your Honor, my whole family is here. I'm young." The court interrupted, giving defendant time to talk with his attorney before proceeding. After a brief recess, the court again inquired whether any force was used or threats or promises made to induce him to plead guilty. Defendant again answered, "No, Your Honor." The court then asked defendant if he was pleading guilty freely and voluntarily, and defendant assured the court he was. The court offered to give defendant additional time to speak with his attorney before proceeding, but defendant declined this offer. After the State presented a factual basis, the court accepted the guilty plea.

¶ 20    Evidence presented at sentencing revealed, while incarcerated on this offense, defendant amassed 19 violations prior to pleading guilty in this case and 13 incidents while awaiting sentencing, including 5 additional criminal charges. Several witnesses testified at defendant's sentencing hearing, and some of these witnesses detailed defendant's abhorrent behavior while in custody. In defendant's lengthy statement in allocution, which was coherent and made without issue, he briefly apologized for his actions and then attempted to minimize his behavior in custody while claiming he "never assaulted nobody sexually." Regarding M.B., whom he assaulted before L.A., he claimed M.B. concocted the allegation in retaliation for a fight between defendant's and M.B.'s sisters.

¶ 21 Also considered at the sentencing hearing was the PSI. The PSI revealed defendant moved from the Democratic Republic of the Congo to the United States around 2015, when he was 15 years old. He attended high school in Normal, Illinois, until he graduated and received his diploma in May 2020. His prior convictions concerned mostly vehicle offenses, such as driving without a driver's license, improper lane usage, and operating a vehicle without insurance. After he was detained for assaulting L.A., he was charged with five offenses committed while he was in custody. These included attempting to obstruct or destroy evidence, two counts of aggravated battery to a peace officer, and two counts of aggravated battery to a nurse. One incident involving a nurse arose after defendant made sexual advances toward her. The PSI indicated that, while in custody, defendant was diagnosed with generalized anxiety disorder, bipolar disorder with depressed episodes, and alcohol and drug use disorders. He was prescribed medication for his illnesses, but when he stopped taking what was prescribed, the medications were discontinued. The PSI also showed that, on the weekends, defendant drank alcohol and used drugs, specifically, marijuana and methamphetamine. Although defendant never " 'blacked out' " from drug use, he did have to go to the hospital after using because his heart was beating very rapidly. Defendant asked for substance abuse treatment, claiming he committed crimes only when he was under the influence of drugs and alcohol.

¶ 22 The trial court, pursuant to the State's suggestion, sentenced defendant to 15 years' imprisonment. Defendant interjected, stating, "[T]hat's not fair." Defendant believed a 15-year sentence was unfair not because he thought he would get less but, as he stated in allocution in addressing the State's proposed sentence, "[he] never done nothing. [He] never sexual nothing."

¶ 23 Seven months after we affirmed defendant's conviction and sentence, he filed,

with the assistance of counsel, a petition for relief under the Act. He alleged he was denied due process "based upon his misunderstandings of his [plea counsel's] suggestions, assurances, and indications that [he] would *probably* only receive 5 years in DOC." (Emphasis added.) In support of this allegation, defendant asserted he was a young student from Africa who had difficulty speaking and writing English. He alleged he talked to his plea counsel about the ramifications of pleading guilty before he agreed to do so and after their conversation, he "was under the impression *** he would receive the minimum sentence of 5 [*sic*] years DOC." Defendant noted he received a sentence of 15 years' imprisonment instead. Defendant then simply asserted, "Had [he] known that he was likely to receive more than 5 years in DOC, he would not have entered a guilty plea to Count I. Instead he would have insisted on a jury trial."

¶ 24        Attached to defendant's petition was his affidavit. In it, defendant attested he "sometimes ha[s] trouble speaking and understanding English when spoken to [him]." He claimed his plea counsel never mentioned he could receive a 15-year sentence and "lulled" him into believing he would be sentenced to only 5 years. In arguing he would not have pleaded guilty to count I and would have proceeded to trial had he known he could receive a 15-year sentence, defendant argued consent would be a difficult issue for the State to disprove.

¶ 25        The trial court advanced defendant's petition to stage two of the postconviction proceedings because eight months had passed since defendant filed his petition. Defense counsel, who was privately retained, did not amend the petition or file a certificate under Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), as none was required. See *People v. Smith*, 2022 IL 126940, ¶ 32. The State moved to dismiss defendant's petition, alleging the record rebutted any contention defendant did not understand the conditions of the guilty plea. In reply, defendant asserted, after he spoke to plea counsel, he "understood *** the other counts and cases against

him would be dismissed, and that he would receive the minimum sentence of 5 [*sic*] years in DOC on count I." He claimed plea counsel "promised" him this. Defendant then argued he "has been denied Due Process by ineffective counsel."

¶ 26    After a hearing on the State's motion to dismiss, at which only arguments were presented, the trial court granted the motion and, thus, dismissed defendant's petition. In so ruling, the court found defendant failed to make a substantial showing his constitutional rights were violated because he alleged only that plea counsel told him he "probably" would receive a five-year sentence. The court also found (1) neither attorney who represented defendant raised an issue about him understanding the proceedings and (2) defendant had no difficulty expressing himself in making a statement in allocution at sentencing. Moreover, the court observed, after defendant was told the responses to the admonishments were not all yes or no, he confirmed he knew he faced a sentence between 4 and 15 years. The court continued, "[Defendant never said] that he thought it was supposed to be five years or any specific number." Likewise, the court noted defendant never indicated plea counsel told him anything other than what the court recited as the terms of the plea agreement.

¶ 27    This appeal followed.

¶ 28                                II. ANALYSIS

¶ 29    At issue on appeal is whether the dismissal of defendant's postconviction petition was proper. Under the Act, a criminal defendant may challenge his conviction and sentence if either resulted from a substantial denial of the defendant's federal or state constitutional rights. *People v. Agee*, 2023 IL 128413, ¶ 36. A petition raising such violations proceeds through the three stages of the Act. *Agee*, 2023 IL 128413, ¶ 36. This appeal concerns the second stage of the postconviction proceedings.

¶ 30       "At the second stage, the State may file a motion to dismiss or an answer to the petition." *Agee*, 2023 IL 128413, ¶ 37. Here, the State filed a motion to dismiss. "In deciding a motion to dismiss, the [trial] court must determine whether the petition and accompanying documents make a substantial showing of a constitutional violation." *Agee*, 2023 IL 128413, ¶ 37. A "substantial showing *** is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle [the defendant] to relief." (Emphasis omitted.) *People v. Domagala*, 2013 IL 113688, ¶ 35. In assessing whether the petition meets this threshold, the allegations in the petition are taken as true unless the record affirmatively rebuts them. *Domagala*, 2013 IL 113688, ¶ 35. "The record" for postconviction proceedings includes "the court file of the proceeding in which the [defendant] was convicted, any action taken by an appellate court in such proceeding and any transcripts of such proceeding." 725 ILCS 5/122-2.1(c) (West 2024). If the petition makes a substantial showing, it advances to the Act's third stage, where an evidentiary hearing is held. *Agee*, 2023 IL 128413, ¶ 37. If no such showing is made, dismissal is warranted. *Agee*, 2023 IL 128413, ¶ 37. We review *de novo* the dismissal of a postconviction petition at the second stage. *People v. Fuller*, 2025 IL App (4th) 231457, ¶ 17.

¶ 31       Defendant argues his petition should not have been dismissed at the second stage because plea counsel was ineffective. To establish a second stage postconviction claim plea counsel provided ineffective assistance, a defendant must make a substantial showing (1) "his counsel's performance fell below an objective standard of reasonableness" and (2) " 'there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.' " *People v. Brown*, 2017 IL 121681, ¶¶ 25-26 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)). Put another way, to prove the second prong, the defendant

must show that rejecting the plea agreement would have been rational given the circumstances of his case. *Brown*, 2017 IL 121681, ¶ 48. The defendant must satisfy both prongs of the ineffective assistance of counsel test, and his failure to satisfy either prong precludes a finding counsel was ineffective. *People v. Torres*, 2024 IL 129289, ¶ 27.

¶ 32        In considering the issue raised, we first address the State's arguments we should "decline to address defendant's claim of ineffective assistance of plea counsel" because (1) defendant never raised counsel's ineffectiveness in the trial court and (2) defendant's brief fails to comply with Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020) by not presenting an ineffective assistance of counsel analysis with citations to relevant authorities. We find neither of the State's contentions, essentially its forfeiture arguments, persuasive. See Ill. S. C. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited."); *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 72; see also *People v. Rodriguez*, 2021 IL App (1st) 200173, ¶ 58 (stating issues not raised in the trial court are forfeited on appeal). First, although perhaps inartful, postconviction counsel alleged plea counsel was responsible for defendant's guilty plea in at least some way. This position is made much clearer in defendant's reply to the State's motion to dismiss, wherein defendant explicitly contended plea counsel was ineffective during the plea process. Second, putting aside the fact the State does not cite the specific paragraph of Rule 341 that is at issue, *i.e.*, paragraph (h)(7), we choose to exercise our discretion and consider the issue defendant raises because his failures under Rule 341(h)(7) do not hinder or preclude our review. See *Glass v. Department of Corrections*, 2023 IL App (4th) 230116, ¶ 12. That said, we remind defendant Rule 341 has the force and effect of law and, practically, should be followed, as disregarding the rule "can weaken the rational persuasiveness of one's brief." *Glass*, 2023 IL App (4th) 230116, ¶ 12.

¶ 33　　　　Turning to the merits, defendant argues plea counsel "induced" him to plead guilty by "misrepresent[ing]" he would receive five years' imprisonment if he pleaded guilty to count I. Defendant intimates his difficulty in writing, speaking, and understanding English, as well as his mental health issues and addiction to drugs, made it easy for plea counsel to persuade him to plead guilty. The record belies all of these claims.

¶ 34　　　　First, nothing in the record suggests defendant had difficulty writing, speaking, or understanding English. Rather, the record reveals defendant was more than adept at these things, as he had lived in the United States for a number of years before the incident, graduated high school in Normal, Illinois, with no indication he required special services, had been in and out of the court system on multiple occasions for various traffic offenses before this incident, navigated the jail's complex automated phone system without any problems, conversed in English with L.A. and those he called while in jail, wrote down phone numbers, called those whose numbers he was given, executed the written plea agreement, and made a coherent statement in allocution at sentencing. At no time did the trial court or either counsel who represented defendant believe defendant could not understand the proceedings, and neither defendant nor anyone else in or out of the court system alerted anyone he was having difficulties comprehending what was happening. As such, no interpreter was needed or ever appeared in court for defendant. Moreover, the record suggests defendant was well aware of legal proceedings in general, such as asking his friend if she posted a "PR bond," and specific legal matters affecting his case, such as the strong probability, before the State filed its motions *in limine*, the case would be dismissed if L.A. failed to come to court.

¶ 35　　　　Similarly, although defendant suffered from several mental illnesses diagnosed while he was in jail and used alcohol and drugs, nothing in the record reveals these maladies

somehow helped plea counsel induce defendant to accept the plea agreement. Aside from the fact nothing in the record reveals defendant's mental health or addictions affected his ability to plead guilty, the record shows neither defendant's alleged weekend only drug and alcohol use, which presumably stopped 17 months before he pleaded guilty, nor his alleged mental illnesses, prescriptions for which he stopped taking without incident, were all that serious.

¶ 36        Nothing in the record indicates defendant was unaware he could be sentenced to 15 years' imprisonment if he pleaded guilty. Before the trial court accepted defendant's guilty plea, defendant executed a written plea agreement. He signed this agreement, which did not provide any sentence was part of the parties' plea deal.

¶ 37        Further, defendant's answers to the trial court's Illinois Supreme Court Rule 402 (eff. July 1, 2012) admonishments make clear defendant knew he could receive a sentence other than five years in prison. "The purpose of the Rule 402 colloquy is to ensure that a defendant's guilty plea is not accepted unless it is intelligent and voluntary." *People v. Ferral-Mujica*, 2017 IL App (2d) 160240, ¶ 25. "This purpose would hardly be served if [the] defendant were allowed to state on the record that no agreements as to sentencing had been reached and then turn around and claim that [there was an] agree[ment] to a [specific] sentence." *Ferral-Mujica*, 2017 IL App (2d) 160240, ¶ 25. Rather, "[i]t would reduce the Rule 402 colloquy to a meaningless exercise." *Ferral-Mujica*, 2017 IL App (2d) 160240, ¶ 25. "As the supreme court stated [long] ago, 'Rule 402 was designed to insure properly entered pleas of guilty, not to provide for merely an incantation or [useless] ceremon[y].' " *Ferral-Mujica*, 2017 IL App (2d) 160240, ¶ 25 (quoting *People v. Krantz*, 58 Ill. 2d 187, 194-95 (1974)). Accordingly, " 'a defendant cannot be rewarded for disregarding the specific admonitions of the court' " by having his plea rendered involuntary when he claims, in contrast to what is evident from the record, there was an agreement made as

to his sentence. *Ferral-Mujica*, 2017 IL App (2d) 160240, ¶ 25 (quoting *People v. Radunz*, 180 Ill. App. 3d 734, 742 (1989)).

¶ 38 Here, at the plea hearing, the trial court ensured defendant understood the terms of the agreement. The court advised defendant in open court he would be sentenced to between 4 and 15 years' imprisonment, and defendant assured the court he knew he was subject to a sentence within this range. Defendant also assured the court more than once nothing other than the terms of the agreement the court recited in open court was promised for his plea and he was entering his plea freely and voluntarily. The court's admonishments about the terms of the agreement and defendant's acceptance of the terms in pleading guilty simply cannot be ignored. *Ferral-Mujica*, 2017 IL App (2d) 160240, ¶ 25. "Had there been an agreement [as to defendant's sentence], it should have been part of [the] colloquy" between defendant and the court. See *Ferral-Mujica*, 2017 IL App (2d) 160240, ¶ 25. The colloquy here contained no such details.

¶ 39 Moreover, defendant never asserted during the plea proceedings, motion to reconsider the sentence, or on appeal to this court he was promised a five-year sentence in exchange for pleading guilty. Rather, the first time defendant argued he was told he could receive five years was in his postconviction petition, wherein he alleged plea counsel told him he "probably" would receive a five-year sentence. Counsel's honest assessment of a sentence within the proper sentencing range a defendant may receive, even if later not realized, does not warrant finding plea counsel ineffective when the sentence counsel proposed is not imposed. See *People v. Wilson*, 295 Ill. App. 3d 228, 237 (1998) ("It is well settled in Illinois that an attorney's honest assessment of a defendant's case may not be the basis for holding a guilty plea involuntary."); see also *People v. Walston*, 38 Ill. 2d 39, 42 (1967) (" 'The mere fact *** that a [defendant] knowing his rights and the consequences of his act, hopes and believes that he will receive a

- 14 -

shorter sentence or milder punishment by pleading guilty than he would upon a trial and conviction by a jury, presents no ground for permitting the withdrawal of the plea after he finds that his expectation has not been realized.' " (quoting *People v. Morreale*, 412 Ill. 528, 532 (1952)).

¶ 40　　　　On this point, we observe, when defendant pleaded guilty, plea counsel, like the State and the trial court, was unaware defendant had any criminal history. Accordingly, plea counsel's belief defendant would receive a five-year sentence is not necessarily outside the realm of what a reasonable attorney might suggest. See *Wilson*, 295 Ill. App. 3d at 237 (noting counsel owes the defendant a duty to inform him about possible outcomes in his case). This changed, however, at the sentencing hearing, where the court, the State, and plea counsel became aware of defendant's 32 jail violations, the 5 charges brought against him while he was in custody, and his minimization of his actions in those cases, this case, and his attack on M.B. It is thus understandable, in light of these new facts, why the court may have imposed a 15-year sentence instead of the 5-year sentence plea counsel might have thought defendant would "probably" receive after he pleaded guilty. Given these facts, we cannot conclude plea counsel's performance fell below an objective standard of reasonableness.

¶ 41　　　　Although this finding on the first prong of the two-pronged ineffective assistance of counsel test ends our inquiry (see *Torres*, 2024 IL 129289, ¶ 27), we briefly comment on the second prong, *i.e.*, whether there is a reasonable probability defendant would not have pleaded guilty and would have, instead, insisted on having a trial had he known he would receive a sentence greater than five years (see *Brown*, 2017 IL 121681, ¶ 26). We find there is no such reasonable probability here. Putting aside the fact defendant makes only a conclusory statement on this point in his petition, which is insufficient (see *Brown*, 2017 IL 121681, ¶ 26), defendant

never indicated he had a meritorious defense or otherwise showed he would have rejected the plea offered and persisted with a trial had he known he would not receive a five-year sentence. See *People v. Edmondson*, 2025 IL App (4th) 240782, ¶ 50 ("The fact that a defendant may not have had a strong defense is merely one fact to consider in determining whether that defendant, properly advised by counsel, would have gone to trial."). While defendant may believe consent is a contentious issue here, the record suggests the opposite. Specifically, the record indicates defendant, a dear friend of L.A.'s family, violated L.A., with whom he had been flirting, by taking her to an unfamiliar location and violently assaulting her when she was passed out in the presence of another man. Despite L.A.'s repeated pleas for defendant to stop assaulting her, he continued to force himself on her until she began crying. When L.A. informed defendant he had raped her, he did not act surprised or apologize. Rather, after his attempt to talk to L.A. was cut short, he contacted L.A.'s family, seeking to ensure L.A. was not going to appear for trial. Only after the State sought to prosecute defendant even if L.A. did not testify at his trial did defendant agree to plead guilty. To us, this suggests defendant, who was not misinformed by plea counsel, did not want a trial of any kind.

¶ 42　　　　In this way, defendant's case is much different than *Edmondson*, on which defendant relies. See *Edmondson*, 2025 IL App (4th) 240782, ¶ 52 ("[W]e conclude that [the] defendant in this case would have rejected any guilty plea that did not offer at least the chance to be sentenced to probation. We also conclude that a reasonable probability exists that, had defendant been properly advised that he was not eligible for probation, he would not have accepted the negotiated guilty plea and, instead, would have chosen to go to trial." (Emphasis omitted.)) Moreover, as part of the plea agreement, the other two counts and serious charges brought against defendant in three separate cases were dropped when defendant pleaded guilty.

Accordingly, we find rejecting the plea agreement would not have been rational given the circumstances of his case.

¶ 43    In sum, we conclude the second-stage dismissal of defendant's postconviction petition was proper because nothing in the record suggested an agreement as to a five-year sentence was made. Even if plea counsel advised defendant that he believed defendant could receive a five-year sentence, such an assessment was not outside what a reasonable attorney would believe given the facts known to plea counsel at the time. Moreover, there was not a reasonable probability that defendant would have rejected the plea offer and demanded a trial had he known he could be sentenced to more than five years. Aside from the fact the evidence against defendant was strong and, by pleading guilty, many charges brought against defendant were dropped, the evidence indicates defendant wanted no trial at all.

¶ 44                                  III. CONCLUSION

¶ 45    For the reasons stated, we affirm the trial court's judgment.

¶ 46    Affirmed.