2025 IL App (1st) 242185-U

FIRST DIVISION
November 17, 2025

No. 1-24-2185

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 04 CR 3557 |
| WILLIAM DUKES, | ) | |
| | ) | Honorable |
| Petitioner-Appellant. | ) | Erica L. Reddick, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Cobbs concurred in the judgment.

**O R D E R**

¶ 1    *Held*: The circuit court's denial of the certificate of innocence petition is affirmed where the petitioner failed to establish by a preponderance of the evidence that he was innocent of the offenses charged in the indictment. See 735 ILCS 5/2-702(g)(3) (West 2020).

¶ 2    Following a jury trial in the circuit court of Cook County, the petitioner, William Dukes, was found guilty of the first-degree murders of Marilyn Williams, and of her eight-year-old

granddaughter, Bridget, and sentenced to natural life imprisonment. The petitioner's convictions were reversed on appeal, and the matter was remanded for a new trial. See *People v. Dukes*, 2014 IL App (1st) 21541–U. Pursuant to a supervisory order (see *People v. Dukes*, 25 N.E. 3d 659 (Jan. 28, 2015)), the appellate court reconsidered its judgment in light of *People v. Rivera*, 2013 IL 112467, but, nonetheless, again reversed the petitioner's conviction and remanded for a new trial. *People v. Dukes*, 2015 IL App (1st) 21541–UB, *pet. for leave to appeal denied,* 39 N.E. 3d 1006 (Sept. 30, 2015) (hereinafter *Dukes II*). At the subsequent retrial, the petitioner was acquitted of all charges. He then filed the instant petition for a certificate of innocence (735 ILCS 5/2-702 (West 2020)). The petitioner now appeals from the circuit court's denial of that petition. He contends that the circuit court erred in finding that he failed to establish by a preponderance of the evidence that he was innocent of the offenses charged. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Because this case spans over three decades, for purposes of brevity, we set forth only those facts and procedural history relevant to the issues raised in this appeal.

¶ 5     At around midnight on August 28, 1993, Marilyn and her granddaughter Bridget were brutally murdered inside their home in Cicero. The petitioner remained a suspect in the case for years, and in October 2003, an undercover police officer unsuccessfully attempted to induce him to confess to the murders. In January 2004, the police arrested the petitioner on unrelated drug charges and questioned him about the Cicero murders. During subsequent plea negotiations with the police and the State's Attorney the petitioner made several inculpatory statements to police and admitted to having killed the two victims.

¶ 6     The petitioner was subsequently charged in a 20-count indictment with the first-degree murders of Marilyn and Bridget, aggravated criminal sexual assault of Bridget, home invasion,

residential burglary, attempted robbery, and concealment of a homicide. Prior to trial, he filed a motion to suppress the inculpatory statements he had made to the police and the State's Attorney during plea discussions, but the circuit court denied that motion.

¶ 7    In 2012, the petitioner proceeded with a jury trial, at which the following relevant evidence was adduced. In the summer of 1993, Marilyn owned a multi-unit building in Cicero. Along with her daughter, Lucy, and Lucy's two children, Bridget and Dustin (then aged 2), Marilyn resided on the second floor. Marilyn leased one of the first-floor units to Marko Tomazovich. For about two months that summer she also rented a bedroom in her apartment to the petitioner. During that time, the petitioner and Lucy became sexually involved. When, in July, Lucy informed the petitioner that she was marrying her long–time boyfriend, Kevin Rhynes, the petitioner and Lucy had sex, and the petitioner wished her good luck. Lucy married Kevin the next morning and moved into his home with her children. Shortly thereafter, the petitioner moved out of Marilyn's house.

¶ 8    Around that same time, Marilyn and Lucy served Tomazovich, who had a serious substance abuse problem, with an eviction notice because he had stopped paying rent. The parties stipulated that upon being served, Tomazovich threatened to kill Marilyn.

¶ 9    At trial, Lucy testified that when she arrived at the courthouse for her wedding on July 24, 1993, she discovered that she had no identification cards and had to use her birth certificate to get married. She averred that after the wedding, the petitioner continued to seek her out even though she repeatedly told him that their relationship was over and that she was now with Kevin. She stated that he once stopped her on the street and gave her back her identification cards. Another time, he came to her and Kevin's home and asked to live with them. On yet a third occasion, he came to Lucy's place of employment and just sat there.

¶ 10    On the evening of August 28, 1993, Lucy left Bridget and Dustin with Marilyn while she

went to work. When Lucy returned to Marilyn's apartment the next morning, she found the front door ajar, Dustin sleeping on the couch, and Marilyn and Bridget dead in the bathtub. After discovering that the telephone line was dead, Lucy roused Tomazovich and they went to a neighbor's house, where she called the police.

¶ 11     The medical examiner determined that Bridget had been raped and then strangled to death and that Marilyn had sustained blunt force trauma to her head before being suffocated. Inside Marilyn's apartment, the police found a comforter soaked with Bridget's blood with several hairs on it. In Tomazovich's unit, the police discovered a bloody t-shirt and bloody jeans, but laboratory tests revealed that the blood matched Tomazovich and not Bridget or Marilyn.

¶ 12     A hair comparison expert testified that the two hairs found on the blood-soaked comforter inside Marilyn's home appeared to be pubic hairs, which matched those of the petitioner. DNA testing on the two pubic hairs confirmed that they matched the petitioner's DNA at two loci, *i.e.*, that about one Caucasian person in 1300 would match the hair's DNA at those two loci. The remaining hairs did not match the petitioner, Marilyn, Bridget, or Tomzaovich. The expert did not know how any of the hairs arrived on the comforter and admitted that they could have been deposited there when the petitioner lived in the house or picked up outside by anyone residing or visiting the residence.

¶ 13     At trial, Tomazovich testified that he witnessed the petitioner murder Marilyn and rape and murder Bridget on April 28, 1993. He averred that at about 10 p.m. that night, the petitioner came to his apartment with beer, asking for money. After Tomazovich replied that he had none, the petitioner suggested that they ask Marilyn, because she often lent money to other people. The two of them went upstairs to Marilyn's apartment. When Tomazovich knocked, Marilyn let him inside and agreed to give him $5. However, when she saw the petitioner behind Tomazovich, she started

yelling. The petitioner shouted back at her, then knocked her down on the ground and started choking her. Tomazovich tried to pull the petitioner off Marilyn, but the petitioner swung a fist and hit Tomazovich on the head. Marilyn tried to get up but the petitioner got back on top of her and choked her. He ordered Tomazovich to hold Marilyn's legs. Tomazovich did as instructed but claimed he let go quickly. However, Marilyn was quiet and already not moving. According to Tomazovich, the petitioner then rummaged through the home, apparently looking for cash.

¶ 14 Tomazovich testified that he then observed the petitioner carry Bridget into the bedroom. Tomazovich followed and saw that the petitioner had taken the girl's pants off. When Tomazovich said, "[W]hat the fuck," the petitioner hit him in the chest. Tomazovich watched the petitioner rape Bridget. Tomazovich tried to grab Bridget, but the petitioner hit him repeatedly and pushed him out of the bedroom. When the petitioner came out, he ordered Tomazovich to help him carry Marilyn into the bathroom and then carried Bridget there himself. When Tomazovich saw Bridget's body on top of Marilyn's in the bathtub he vomited. The petitioner threatened Tomazovich that he would do the same to his children if Tomazovich said anything. Tomazovich returned downstairs to his apartment where he took off his soiled clothes. He testified that he did not remember how he got blood on his clothes, but he thought his nose might have bled.

¶ 15 On cross-examination, Tomazovich admitted that in his initial interview with the police on August 29, 1993, he did not relate any of these facts and instead claimed that he knew nothing about the murders. He also acknowledged that when the police questioned him about the murders in March 1995, while he was serving a sentence on an unrelated robbery conviction, he again denied any knowledge. Tomazovich testified that after subsequently being presented with DNA evidence linking his vomit to the crime scene, in August 1995, he admitted that he watched the petitioner murder Marilyn and rape and murder Bridget, after which he vomited in the bathroom.

5

He stated that it was not until 1998 that he finally admitted that he held Marilyn's legs down while the petitioner choked her. Tomazovich also acknowledged that in October 2003 he reached a deal with the State pursuant to which he agreed to testify against the petitioner and plead guilty to home invasion in exchange for the State dropping murder charges against him.

¶ 16 To persuade the jury that Tomazovich had not concocted his account of the murders in response to police questioning years after the crimes took place, the State asked Tomazovich about a conversation he had with his friend, Arlene Kwil, in a bar a few days after the murders. He stated that he vented to Arlene about how he could not help the kids out and could not stop the petitioner. He also testified that after the police confronted him with this statement to Arlene, a few days later, he told them he knew nothing about the murders.

¶ 17 At trial, the State next elicited testimony from Sergeant James Washburn, who interviewed the petitioner upon his arrest on drug charges in 2004. Sargent Washburn testified that the petitioner said, " 'he wished "to get this off [his] chest[,]" ' " and that when asked whether he was prepared to admit that he murdered Marilyn and Bridget, he responded, "[Y]es, yes, I am."

¶ 18 A second police officer, Detective Darlene Sobczak, testified that she had previously arrested the petitioner in 1995 as a suspect in the murders of Marilyn and Bridget. At that time, a portion of Lucy's driver's license with her photograph was found inside his wallet. When questioned about this picture, the petitioner stated that Marilyn had asked him to stop Lucy from marrying Kevin, and that he took Lucy's identification cards when they had sex the night before her wedding, thinking that she could not get married without them. Detective Sobczak further testified that throughout his interview, the petitioner repeatedly referred to Lucy "wanting him," and enjoying "rough sex." The petitioner also told the detective that on the day of the murders, he spent the afternoon with a friend, after which he went to another friend's house before staying the

6

night at a crack house. Detective Sobczak found the crack house and verified that he did not spend the night there on August 28, 1993.

¶ 19    Based on this evidence, the jury found the petitioner guilty of the first-degree murders of both Bridget and Marilyn. The circuit court subsequently sentenced the petitioner to natural life imprisonment.

¶ 20    The petitioner appealed, contending that the circuit court committed reversible error when it: (1) denied his motion to suppress the inculpatory statements and expressions of remorse he made during his plea negotiations with the State; (2) denied his motion to strike all references to Lucy and him enjoying "rough sex," and (3) permitted Tomazovich to testify about his conversation with Arlene. *Dukes*, 2014 IL App (1st) 21541-U, ¶ 30. The appellate court agreed and reversed and remanded the case for a new trial. Id. ¶¶ 37, 39, 40, 60.

¶ 21    Pursuant to a supervisory order from the Illinois Supreme Court (*Dukes*, 25 N.E. 3d 659 (Jan. 28, 2015), the appellate court reconsidered its holding regarding the inadmissibility of the petitioner's inculpatory statements to police under the holding in *Rivera*, 2013 IL 112467. *Dukes II*, 2015 IL App (1st) 21541–UB, *pet. for leave to appeal denied,* 39 N.E. 3d 1006 (Sept. 30, 2015). The appellate court, nonetheless, again held that the introduction of the inculpatory statements was erroneous and remanded the matter for a new trial. *Id.*

¶ 22    On January 23, 2018, prior to the petitioner's retrial, the parties made several stipulations regarding what evidence could be introduced therein. First, they agreed that while the State could introduce evidence that in 2004, the petitioner said that "he wanted 'to get this off [his] chest' " and he would tell [a detective] about his participation in the murders of Marilyn and Bridget," no evidence would be offered regarding any of the petitioner's statements to police that he would admit to killing Marilyn and Bridget if the State agreed not to seek the death penalty or that he

felt remorse for committing the murders. In addition, the parties agreed that there would be no references to "rough sex," and that Tomazovich would not be allowed to testify that, shortly after the murders, he told Arlene that "he 'couldn't help the kids out' and he 'couldn't stop [the petitioner.]'"

¶ 23    On April 30, 2019, the petitioner proceeded by way of a bench trial. On appeal, the petitioner asserts that the testimony from his first trial was admitted at retrial by way of stipulation, and that he did not testify. The record before us, however, does not contain such a stipulation, or any transcript of the post-remand proceedings, including the petitioner's retrial. Nor does it include any acceptable substitute such as a bystander's report or an agreed statement of facts. See Ill. S. Ct. R. 323 (eff. July 1, 2017). Therefore, we do not know what type of evidence or testimony was introduced at retrial or what arguments, if any, were made by counsels, nor the basis for the trial judge's decision. All we can glean from the record is that on July 11, 2019, the trial judge acquitted the petitioner of all charges.

¶ 24    On July 12, 2021, the petitioner filed the instant petition for a certificate of innocence. In support, he attached his notarized verification affidavit and a copy of the appellate court's 2014 Ruler 23 order reversing his convictions and remanding for a new trial. See *Dukes*, 2014 IL App (1st) 121541–U.[1]

¶ 25    After numerous continuances, the State informed the court that it was electing not to oppose the certificate of innocence. The petitioner then supplemented his petition with a transcript of his January 17, 2023, deposition testimony from a federal civil rights case, alleging

---

[1] We note that the appellate court's 2014 decision and its 2015 decision entered pursuant to our supreme court's supervisory order contain an identical recitation of the evidence and the facts established in the underlying criminal proceedings, as set forth above. *Compare Dukes*, 2014 IL App (1st) 121541–U, ¶¶ 4–26, with *Dukes II*, 2015 IL App (1st) 121541–U, ¶¶ 4–26.

improprieties in the investigation resulting in his original conviction in the instant matter. See

*Dukes v. Washburn, et. al*., 600 F. Supp. 3d 885 (N.D. Ill. 2022).

¶ 26    In that deposition, taken while the petitioner was in custody on an unrelated charge, the

petitioner denied his involvement in the murders and presented an account of his movements

prior to and during the crime. The petitioner's testimony spanned over seven hours, during which

he often went-off topic, made unrelated comments, and vented his feelings. For example, he

made repeated references to John Wayne Gacey in relation to remembering a friend's name and

mentioned the 1994 Illinois license for bribe scandal when attempting to explain why he had

three different social security numbers. The petitioner also offered numerous theories and

opinions as to potential alternate suspects in Marilyn's and Bridget's murders. For example, he

testified that a young man, named Keith, whose "mouth was wired shut" with braces or "rubber

bands," also lived in Marilyn's house in the summer of 1993 and was attracted to Lucy. He

similarly averred that Tomazovich was an abusive alcoholic, and that he personally witnessed

him threatening to hurt Marilyn and Lucy upon being given the eviction notice. The petitioner

also blamed the murders on Dustin's biological father, David Martin, who worked as a guard for

the Illinois Department of Corrections, claiming that the police had "pushed [him] off the radar"

as a suspect "to appease his uncle who was a State Police investigator" investigating "dirty

Cicero cops."

¶ 27    Relevant to his claim of innocence, the petitioner averred that at midnight on August 28,

1993, at the time of the murders, he was entering a house at 2758 North Richmond, where he

lived with Irma Jamarillo and her family.[2] Prior to that, he had spent the day visiting numerous

---

[2] According to the petitioner, the Jamarillo family included Irma, her husband Aaron, Efrain Jamarillo, Pedro Jamarillo, Efrain's brother Fernando, Guadalupe, Lupe and two teenage children, Carla and Novix.

friends. First, at 11 a.m., he went to repair a car with Mark Bowling in Westmont. After learning from Bowling that their customer had cancelled the car repair job, he returned home at about 1:30 p.m. At around 4:30 p.m., he went to visit Russell Farmer, a classmate from Lincoln Tech, who lived at 78th Street. The petitioner arrived at Farmer's house at about 7:30 p.m., but Farmer was not there so the petitioner left him a note on the door. On his way back home, the petitioner stopped at a liquor store and bought a six-pack of beer. While on Lake Shore Drive, he stopped at a roadway indentation near 63rd Street, popped his hood, put the hazards on, jumped the fence, and went to sit by the lake and drink his beer. After finishing the six-pack, the petitioner went to visit his friend Angelo, who lived in the 1900 block of Sawyer. He arrived at Angelo's house at about 9 p.m. After drinking some beer, the two of them bought crack cocaine from a place on the street. Upon returning to Angelo's, they realized that the drugs were fake and made of soap and drywall. The petitioner then headed home, where he arrived at about midnight. Because the doors were locked, he went around and knocked on a bedroom window. The person who was sleeping in that room, a woman named Laura, whom the petitioner described as "frumpy" and a "cat lady," let him inside.

¶ 28    The petitioner acknowledged that he was not in contact with any of these witnesses, and that some of them "wanted nothing to do with him," such that he did not know whether or where they could be found.

¶ 29    In his deposition, the petitioner also described his living arrangements with Marilyn. He asserted that after meeting Marilyn at a flea market in April 1993, Marilyn arranged for him to get a job as a mechanic at a nearby garage and to move into her house. The petitioner rented the rear bedroom of the apartment where Marilyn lived with Lucy and her two children for $50. Another tenant, Keith, rented a unit on the second floor, while Tomazovich and his girlfriend

lived in the apartment below.

¶ 30    The petitioner claimed that he had always disliked and "stayed away" from Tomazovich, but admitted that sometime between 1999 and 2003, while serving his four-year sentence on an unrelated forgery conviction, he wrote a letter to Tomazovich, who had then been the only one charged with Marilyn's and Bridget's murders, to tell him about the federal corruption case against the Cicero police.

¶ 31    The petitioner also acknowledged that while living with Marilyn in May 1993, he began a relationship with Lucy, which lasted until July 24, 1993, when she married Kevin. The petitioner repeatedly described their relationship as "friends with benefits" or "f*** buddies." He also claimed that Marilyn had encouraged their relationship because she opposed Lucy dating Kevin and even tried to teach Dustin to call the petitioner "Daddy Bill." The petitioner admitted that he and Lucy spoke about marriage, but claimed that they never considered it seriously.

¶ 32    The petitioner also acknowledged that he first learned of Lucy's plans to marry Kevin on the night before her wedding, but claimed that this did not bother him and that the two of them had sex that night and stayed up until 6 a.m. He asserted that as soon as he woke up, Marilyn gave him several of Lucy's identification documents and asked him to hide them so that Lucy could not marry Kevin. The petitioner obliged and placed the documents in his truck on his way to work. When he returned to Marilyn's home around noon, he found Lucy in her room packing. Marilyn had "kicked her out" after learning she was married and instructed her to take the children and live with Kevin. The petitioner claimed that Marilyn was afraid that Kevin would not let Lucy and the children visit her if the petitioner continued to live there. When Lucy asked the petitioner whether he had her documents, he admitted taking them and returned them to her.

Two days later, he also moved out of Marilyn's home.

¶ 33    Even though the petitioner denied that he knew where Lucy worked at the time of the murders, he admitted that he saw her a few times after her July wedding. He, nonetheless, repeatedly asserted that he never sought her out. For example, he averred that on one occasion, he was getting auto parts in the same strip mall where Lucy worked as "a cocktail waitress at a semi strip club or a quasi strip club" and she asked him to leave because "they didn't want the patrons fraternizing with the help because it looked like a prostitution ring or something." On another, he "didn't go to see her" but just "seen her out front" of her home with Kevin, whereupon Kevin initially wanted to fight him, but then invited him to live with Kevin and Lucy.

¶ 34    The petitioner also acknowledged that two years after Marilyn's and Bridget's murders, the police found a portion of Lucy's driver's license in his wallet. He claimed, however, that this photo came from an old state identification card that the two of them had found while rummaging through some drawers when they were still together, and that Lucy told him he could keep it.

¶ 35    During his deposition, the petitioner also admitted that he has been an alcohol and cocaine addict his whole life. He also acknowledged that his prior criminal history included at least seven felony convictions, including, *inter alia*, forgery, theft, and criminal sexual abuse. The petitioner also testified that he was previously diagnosed with, *inter alia*, schizoaffective disorder and antisocial personality disorder.

¶ 36    On October 9, 2024, the circuit court held a hearing on the certificate of innocence petition. The petitioner did not testify or present any evidence at the hearing. Instead, his counsel argued that the petitioner was entitled to a certificate of innocence based on the documentary

evidence attached in support of his pleading.

¶ 37    On October 25, 2024, the circuit court denied the petition. The court found that the petition was timely, and that all the requirements for the petition were met, except for one—that the petitioner had proven by a preponderance of the evidence that he was innocent of the crimes charged. The court noted that without the testimony excluded by the appellate court, the case boiled down to a contest between Tomazovich's testimony regarding the murders and the petitioner's denials regarding any participation. The court noted that it was not making any credibility determinations but was basing its decision on the "cold pleadings" before it. Based on those pleadings, the court found that the petitioner had failed in his burden to establish by a preponderance of the evidence that he was innocent of the crimes charged. As the court explained, the petitioner "could have committed them" and he "could well have not." The petitioner now appeals.

¶ 38                                      II. ANALYSIS

¶ 39    On appeal, the petitioner contends that the circuit court erred in denying his petition for a certificate of innocence. For the following reasons, we disagree.

¶ 40    Pursuant to section 2-702(b) of the Code of Civil Procedure (Code), any person convicted and subsequently imprisoned in Illinois for one or more felonies "may under the conditions hereinafter provided, file a petition for certificate of innocence in the circuit court ***." 735 ILCS 5/2-702(b) (West 2020). To obtain a certificate of innocence, the petitioner must prove four elements by a preponderance of the evidence:

          "(1) the petitioner was convicted of one or more felonies by the State of Illinois and

              subsequently sentenced to a term of imprisonment, and has served all or any part of the

13

sentence;

(2)(A) the judgment of conviction was reversed or vacated, and the indictment or information dismissed ***;

(3) the petitioner is innocent of the offenses charged in the indictment or information ***; and

(4) the petitioner did not by his *** own conduct voluntarily cause or bring about his *** conviction." 735 ILCS 5/2-702(g) (West 2020).

"If the court finds that the petitioner is entitled to a judgment, it shall enter a certificate of innocence finding that the petitioner was innocent of all offenses for which he *** was incarcerated." 735 ILCS 5/2-702(h) (West 2020).

¶ 41    The purpose of the certificate of innocence statue is to provide petitioners with a means of obtaining relief against the State for wrongful incarceration through the court of claims. See 735 ILCS 5/2-702(a) (West 2020); *People v. Hood*, 2021 IL App (1st) 162964, ¶ 22 (citing *People v. Rodriguez v. Cook County, Illinois*, 664 F. 3d 627, 630 (7th Cir. 2011); see also and *Betts v. United States*, 10 F. 3d 1278, 1283 (7th Cir. 1993) ("[a] certificate of innocence serves no purpose other than to permit its bearer to sue the government for damages.") Where a petitioner obtains a certificate of innocence, it is "all but certain that the petitioner can obtain a money judgment against the State for wrongful incarceration." *People v. Moore*, 2020 IL App (1st) 190435, ¶ 37.

¶ 42    In the present case, the parties agree that the petitioner has met three of the four elements required to obtain a certificate of innocence. 735 ILCS 5/2-702(g) (1), (2), (4) (West 2020). Their only disagreement involves whether the petitioner proved by a preponderance of the evidence that he is "innocent of the offenses charged in the indictment or information." 735 ILCS 5/2-702(g)

(3)(West 2020).

¶ 43     At the outset, the petitioner argues that because the State did not oppose his petition in the circuit court, in order to make a *prima facie* showing of this element, and thereby succeed on his petition, he was not required to prove by a preponderance of the evidence that he *was* innocent of the crimes charged but rather only needed to show that he *could* be innocent. For the following reasons, we disagree.

¶ 44     An issue of statutory construction in a certificate of innocence petition is a question of law that is reviewed *de novo*. *People v. Reed,* 2025 IL 130595, ¶ 25; *People v. Hilton*, 2023 IL App (1st) 220843, ¶ 15; *People v. Brown*, 2022 IL App (4th) 220171, ¶ 11; *People v. Moore*, 2020 IL App (1st) 190435, ¶ 11. In interpreting a statute, our primary goal is to ascertain and give effect to the legislature's intent, which is best ascertained by looking at the statute's language, given its plain and ordinary meaning. *Reed,* 2025 IL 130595, ¶ 25; *People v. Reese*, 2017 IL 120011, ¶ 30. "We may not 'depart from the plain language and meaning of the statute by reading into it exceptions, limitations, or conditions that the legislature did not express.' " *Reed,* 2025 IL 130595, ¶ 25 (quoting *People v. Woodard*, 175 Ill. 2d 435, 443 (1997)). Moreover, we must keep in mind the purpose behind the statute and presume that the legislature did not intend to create inconvenient, absurd or unjust results. *Reed,* 2025 IL 130595, ¶ 26.

¶ 45     Section 2-702 of the Code plainly provides that "[i]n order to obtain a certificate of innocence the petitioner *must* prove *by a preponderance of evidence*" the four elements set forth in subsection (g). (Emphasis added.) 735 ILCS 5/2-702(g) (West 2020). The statute therefore expressly *requires* the petitioner to prove his innocence, and places the burden of proof on him, and not the State. See *People v. Terrell*, 2022 IL App (1st) 192184, ¶ 46 (holding that the legislature "set forth that the burden is on the petitioner and did not provide for the shifting of

15

this burden.")

¶ 46    Moreover, the statute expressly defines the petitioner's burden of proof as being "a preponderance of the evidence." While the statute does not elaborate on what "a preponderance of the evidence" entails, our courts have repeatedly held that it means "more probably true than not true." *Id*. (citing *People v. Simon*, 2017 IL App (1st) 152173, ¶ 21, *Hood*, 2021 IL App (1st) 162964, ¶ 29; *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 191 (2005); Illinois Pattern Jury Instructions, Civil, No. 21.01 (approved Dec. 8, 2011)). This burden remains the same, regardless of whether the petitioner chooses to "proceed through live testimony or documentary evidence." *Rodriguez*, 2021 IL App (1st) 200173, ¶ 45.

¶ 47    Thus, under the plain language of the statue, regardless of the State's participation, the petitioner bears the burden of proving by a preponderance of the evidence that he is innocent of the crimes charged. Accordingly, to succeed on his petition, the petitioner was required to show not only that he *could* be innocent of the crimes charged, but rather that it is "more probably true than not" that he *was* innocent of those crimes. Interpreting, as the petitioner would have us do, section 702(g)(3) of the Code "to merely require 'some evidence,' [of his innocence] would fail to comport with the plain, ordinary meaning of a 'preponderance of the evidence.' " *Terrell*, 2022 IL App (1st) 192184, ¶ 46.

¶ 48    Having clarified the petitioner's burden of proof, we must next decide whether the court properly concluded that the petitioner failed to meet it.

¶ 49    In this respect, the parties initially dispute the appropriate standard of review. The State asserts that the applicable standard is abuse of discretion, while the petitioner urges us to apply *de novo* review. In doing so, the petitioner acknowledges that the majority of our appellate decisions hold that the determination of whether a petitioner has established that he was innocent

of the crimes charged is reviewed for an abuse of discretion (see *Rodriguez*, 2021 IL App (1st) 200173, ¶ 44 (collecting cases)), but that one panel of this court has held that because this determination requires the circuit court to evaluate factual evidence, the appropriate standard of review is manifest weight of the evidence (compare *People v. McIntosh*, 2021 IL App (1st) 171708, ¶ 40). See *People v. Washington*, 2023 IL 127952, ¶ 47 (recognizing the split in authority on the standard of review question but declining to address it). He further concedes that both abuse of discretion and manifest weight of the evidence are deferential standards of review. *Terrell*, 2022 IL App (1st) 192184, ¶ 51; Compare *Rodriguez*, 2021 IL App (1st) 200173, ¶ 47 (explaining that the circuit court abuses its discretion "only when its ruling is arbitrary, fanciful or unreasonable or where no reasonable person would take the view adopted by the [circuit] court.") with *People v. Banks*, 2020 IL App (2d) 180509, ¶ 25 (quoting *People v. Deleon*, 227 Ill. 2d 322, 332 (2008) (" "a finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented.' "). Nonetheless, the petitioner asserts that because the circuit court, here, held a nonevidentiary hearing and made its determination regarding his innocence purely based on documentary evidence, we, as the reviewing court, owe it no deference and should reach our own conclusions. See *People v. Avdic*, 2023 IL App (1st) 210848, ¶ 25 (In *de novo* review we "perform the same analysis that [the circuit court] would.").

¶ 50    The petitioner's argument is unpersuasive. "It is well settled that the determination of whether the petitioner is entitled to a certificate of innocence is committed to the discretion of the circuit court." *Rodriguez*, 2021 IL App (1st) 200173, ¶ 44. Indeed, the statute itself explicitly provides that the circuit court shall "*exercise[e] its discretion* as permitted by law regarding the *weight* and admissibility of evidence submitted pursuant to this Section." (Emphasis added.) 735

ILCS 5/2-702(a) (West 2020). Moreover, we have previously held that because the statute places the burden of proof on the petitioner to establish his innocence by a preponderance of the evidence, and that burden neither shifts nor changes depending upon "whether the petitioner chooses to proceed through live testimony or documentary evidence," the circuit court's obligation to weigh the evidence remains unchanged. *Rodriguez*, 2021 IL App (1st) 200173, ¶ 45. Concomitantly, the petitioner "cannot alter the standard of review on appeal by choosing to proceed [solely] through documentary evidence." *Rodriguez*, 2021 IL App (1st) 200173, ¶ 45. Accordingly, we have previously applied "an abuse of discretion standard, even where a petitioner proceeded solely on documentary evidence without an evidentiary hearing." *Rodriguez*, 2021 IL App (1st) 200173, ¶ 47; see *e.g.*, *People v. Gomez*, 2021 IL App 192020, ¶ 40 (applying an abuse of discretion standard in reviewing the circuit court's denial of a certificate of innocence petition solely on the documentary evidence and the arguments of counsel); *People v. Amor*, 2020 IL App (2d) 190475, ¶ 14 (reviewing the denial of a certificate of innocence for an abuse of discretion even though there was no evidentiary hearing and the circuit court's determination was based only on the record; refusing to apply *de novo* review because the circuit court's ruling did not show that there was any error of law, such as a "legal misinterpretation or improper legal conclusion.").

¶ 51    We continue to adhere to this rationale and believe that the appropriate standard of review is abuse of discretion. Nonetheless, we would reach the same result regardless of the standard applied.

¶ 52    Turning to the merits, for the following reasons, we find that the petitioner has failed to establish by a preponderance of the evidence that he was innocent of the murders of Marilyn and

Bridget, such that the circuit court's denial of his petition was proper.

¶ 53    As already noted above, "[a] proposition is proved by a preponderance of the evidence when the proposition is more probably true than not true." *People v. Love*, 404 Ill. App. 3d 784, 787 (2010). In determining whether the petitioner has met this burden, the circuit court must "consider the petition itself and the 'documentation demonstrating' the petitioner's innocence submitted along with the petition, regardless of whether it was previously admitted at the petitioner's underlying trial." *Terrell*, 2022 IL App (1st) 192184, ¶ 55 (quoting 735 ILCS 5/2–702(a), (c) (West 2020)); see also *Washington,* 2023 IL 137952, ¶ 50 (citing *People v. Fields*, 2011 IL App (1st) 100169, ¶ 19) ("The court must consider the materials attached to the petition in determining whether to issue a certificate of innocence."); *Hood*, 2021 IL App (1st) 162964, ¶ 23 ("In determining whether a petitioner has showed by a preponderance of the evidence that he is innocent of the charged offenses, the trial court must consider the [supporting] materials attached to the petition."). The circuit court, as the fact finder, must then "exercis[e] its discretion *** regarding the weight and admissibility of the evidence submitted" and determine whether the petitioner has met his burden. 735 ILCS 5/2-702(a) (West 2020).

¶ 54    In the present case, the circuit court properly considered the averments in the petitioner's pleading and his supporting documents, namely, the 2014 appellate court decision reversing his murder convictions (*Dukes*, 2014 IL App (1st) 21541–U), and his 2023 deposition testimony in the federal civil rights case. In assessing these documents, the circuit court properly discounted evidence that the appellate court had found was erroneously admitted at the petitioner's original trial. It then carefully weighed the sworn trial testimony of Tomazovich and the forensic evidence linking the petitioner to the crime scene (*i.e*., his pubic hairs, which were recovered from the comforter soaked in Bridget's blood) against the petitioner's subsequent assertions of

19

innocence and his deposition testimony regarding potential alibi witnesses who could attest to his whereabouts at the time of the crime. The circuit court acknowledged that Tomazovich was not a great trial witness, but that the petitioner's firm denials were also plagued by his admission "to regular drug use during this time." The court also noted that the petitioner had a motive to hurt Marilyn and Bridget because Lucy had left him to marry Kevin and that he kept a photo of Lucy in his wallet even two years after the murders. The court also found it relevant that the petitioner had previously been convicted of *inter alia*, forgery and theft (both crimes that involve deceit). The court ultimately concluded that while the evidence before it was insufficient to prove guilt "beyond a reasonable doubt at a criminal trial," considering the petitioner's "burden as part of [the instant] civil proceeding," the petitioner had failed to establish by a preponderance of the evidence that he was innocent of the crimes charged. As the court explained, based on the documentary evidence provided by the petitioner himself, the question of the petitioner's innocence remained a 50/50 proposition.

¶ 55    After a thorough review of the record, we find nothing arbitrary, fanciful, or unreasonable in this conclusion. *Rodriguez*, 2021 IL App (1st) 200173, ¶ 47. The documentary evidence offered by the petitioner in support of his claim of innocence leads to two equally plausible conclusions: (1) that he and Tomazovich perpetrated the crimes together; or (2) that Tomazovich committed the crimes alone, but falsely implicated the petitioner in order to cut a deal with the State. According to the 2014 appellate court decision, forensic evidence linked both the petitioner and Tomazovich to the crime scene. Specifically, two of the petitioner's pubic hairs were found on the blood-soaked comforter where Briget was raped, while Tomazovich's vomit was in the bathroom, where he claimed to have vomited after seeing Bridget's body. Moreover, both men had motives to commit the crimes: the petitioner because Lucy married her ex-

boyfriend Kevin, the very next morning after they were intimate, and Tomazovich because Marilyn and Lucy had given him an eviction notice. Both men also abused drugs at the time.

¶ 56    While Tomazovich's testimony could have been motivated by a desire to have the murder charges dropped against him, it is undeniable that he testified it was the petitioner who choked Marilyn and raped and killed Briget, while he only briefly held Marilyn's legs and helped carry her body into the bathroom after the petitioner hit and threatened him. Similarly, while the petitioner attested in his deposition that at the time of the murders, a woman named Laura opened the door to his home to let him inside after he had spent the afternoon with a friend named Angelo drinking and buying bad crack cocaine, he could not remember Laura's or Angelo's last names or provide any contact information for them. What is more, according to the 2014 appellate court decision, which he, himself, attached to his petition, upon his arrest in 1995 the police investigated his similar claims regarding his whereabouts and verified that he was not at a crack house at the time of the murders. Accordingly, under this record, while the evidence of the petitioner's guilt was close, it failed to tip the scale in his favor. As such, the petitioner did not meet his burden of showing by a preponderance of the evidence that "it was more probably true than not" that he was innocent of the crimes charged. *Terrell*, 2022 IL App (1st) 192184, ¶ 46.

¶ 57    In coming to this conclusion, we have reviewed the decision in *Hood*, 2021 IL App (1st) 162964, relied on by the petitioner, and find it inapposite. In that case, the petitioner was convicted of armed robbery and murder of a college basketball star and sentenced to 75 years' imprisonment. *Id*. ¶ 3. After a 2014 investigative article in the New Yorker, the petitioner's sentence was commuted by the governor. *Id*. Thereafter, the State, on its own motion, moved to vacate the petitioner's conviction, granting him a new trial, and subsequently *nolle-prossing* all

charges. *Id.* ¶ 5.

¶ 58    The petitioner then sought a certificate of innocence, supporting it with: (1) affidavits from two witnesses recanting their trial testimony; (2) deposition transcripts from unrelated police misconduct cases supporting the petitioner's allegations of police coercion; and (3) media articles and criminal records relating to the petitioner's theory that the victim's father, who had committed similar crimes in the past, had killed the victim in order to recover on the victim's life insurance policy. *Id.* ¶¶ 33-43. At the certificate of innocence hearing, the petitioner testified he did not know the victim, denied committing the crimes, and detailed the physical and mental abuse he had suffered at the hands of the police prior to being charged. *Id.* ¶¶ 13-15. The State did not oppose the petition. *Id.* ¶ 13.

¶ 59    After the circuit court denied the petition, the appellate court reversed, holding that the petitioner had established by preponderance of the evidence that he was innocent of the crimes charged. *Id.* ¶ 43. In doing so, the appellate court found that the petitioner's testimony at the certificate of innocence hearing regarding the abuse he suffered at the hands of the police remained unrebutted and that in discounting it as incredulous, the circuit court had improperly taken judicial notice of the prior sworn testimony from the petitioner's criminal trial. *Id.* ¶¶ 36, 43. While the *Hood* court acknowledged that pursuant to section 2-702(f) of the Code the circuit court was permitted to take judicial notice of such testimony at a certificate of innocence hearing, where the State did not contest the petitioner's innocence (either at the trial level or on appeal), the circuit court had improperly taken on the role of advocate instead of fact finder. *Id.* ¶ 32. Accordingly, because the circuit court "erred in failing to limit its consideration to the testimony, pleadings, and exhibits filed[,]" and the petitioner was the sole witness to testify at the certificate of innocence hearing, with the State offering no evidence whatsoever tending to prove that the

petitioner was guilty of the crimes charged, the petitioner had met his burden in establishing his innocence. *Id.* ¶¶ 32, 43.

¶ 60 Unlike *Hood*, in the present case, it is undeniable that the circuit court did not venture outside the record and instead decided the petition purely on the documentary evidence provided to it by the petitioner himself. Moreover, because the petitioner in the instant case did not testify at the certificate of innocence hearing, the court made no credibility determination and there was no unrebutted testimony. Instead, after weighing the documentary evidence, the court concluded that the petitioner had failed to show that it was more probably true than not that he was innocent of the crimes charged and, instead, equally proved that he "could have committed these crimes" and that he "could well have not." Accordingly, *Hood* does not apply.

¶ 61                                      III. CONCLUSION

¶ 62 For these reasons, we find that the circuit court properly denied the petitioner's request for a certificate of innocence and therefore affirm its judgment.

¶ 63 Affirmed.